IN THE UNITED STATES DISTRICT COURT FOR THE FILED
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION   97 MAR 18 PM 12: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

MAR 18 1997

| | |
|---|---|
| EUGENE McWILLIAMS; GLORIA T. McWILLIAMS,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>AMERICAN MEDICAL INTERNATIONAL, INC.,[1]<br><br>　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO.  95-G-0586-S<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM OPINION

STATEMENT OF FACTS

        Plaintiff Eugene McWilliams began working for Brookwood

Health Services, predecessor to American Medical International

[hereinafter AMI], around 1975 or 1976, accepting an early

retirement therefrom about April 15, 1987.[2]  In 1983, prior to

---

        [1]  In 1995 American Medical International, Inc., merged with
National Enterprises, Inc.  The consolidated company became Tenet
Health Care Corporation [hereinafter Tenet].  For purposes of
this suit the named defendant is American Medical International,
Inc.

        [2]  Mr. McWilliams served as president of Brookwood Recovery
Centers and vice president of the parent company AMI at the
time he retired.

42

plaintiff's decision to accept early retirement, he had received
an unsolicited mailing from Royce Diener, CEO and Chairman of
AMI, describing the employee programs available to retirees.[3]
Offers extended in Mr. Diener's letter were never withdrawn.  Mr.
McWilliams shared the letter with his wife, discussed it with
her, and relied on it in making his decision to retire.
Pertinent portions of the letter follow:

### MEDICAL PLAN COVERAGE FOR EARLY RETIREES

> Until now, AMI executives who retire early often could
> not obtain group medical coverage for themselves and
> their dependents.  They would have to purchase costly
> individual medical insurance--if they could qualify.
> Now, you can continue AMI's regular group medical plan[4]
> by making optional payments for you and your dependents
> if you qualify for early retirement under one of AMI's
> retirement plans.  *This coverage will continue until
> you or your covered dependents are eligible to receive
> Medicare.*  Please contact your local benefits
> representative for information about the cost of this
> benefit (emphasis added).

Prior to retiring Mr. McWilliams discussed his re-
tirement plans with Dr. John (Jack) Moxley, AMI senior vice
president and his supervisor.  McWilliams' understanding of his

---

[3]  Plaintiffs' Exhibit No. 1.  The May 11, 1983, letter from
Mr. Diener was addressed to Mr. Gene McWilliams personally at his
business address at Brookwood Lodge.  The letter also presumably
went to other AMI executives, but Mr. McWilliams has no knowledge
of whether or not the other retirees received the mailing.  He
did not contact Diener or anyone at AMI about the letter.  The
letter before the court is specifically addressed to the plain-
tiff, justifying his trial references to it as a letter
"outlining my benefits."

[4]  This was a self-funded, self-insured medical plan.
*Transcript at 204.*

retirement, uncontroverted by Moxley, was he would be provided coverage until reaching age 65.  Moxley never mentioned AMI termination rights.  McWilliams' uncontroverted trial testimony was that his retiree coverage under the medical plan would be the same **as that of all other participants, including active employees and executives.**  *Transcript at 65-66.*

Ms. Diane Martindale, director of benefit projects for Tenet, the successor merged company, and its corporate representative, acknowledged that prior to 1993 all "cost-cutting" amendments had applied equally to all classes of participants including active employees and retirees.[5]

As an AMI executive, McWilliams (and his dependents) was covered through the company's **non-ERISA** Executive Health Plan--a "top hat plan" only for executives and "exempt from E.R.I.S.A. requirements."[6]  *Transcript at 188-189.*  Ms. Martindale acknowledged this Executive Health Plan was simply **an insurance contract between AMI and Northwest National Life Insurance Company,** (*Transcript at 188),* **that contained no provision granting termination rights to the employer.**

---

[5] The 1993 amendment terminating retiree coverage did **not** apply to all classes of participants, only retirees.

[6]  All spelling and punctuation in quoted transcript testimony is as it appears in the transcript.

*Transcript at 149, 156, 158.* **There were no plan documents other than the insurance contract.** *Transcript at 189.*

In addition to the Executive Health Plan, AMI maintained and administered an ERISA health plan, the Group Medical Plan [hereinafter GMP] for other, non-executive, employees. After retirement, by the Diener letter contract, the McWilliams and other retirees were changed from the Executive Health Plan to the GMP, the self-funded, self-insured medical plan. *Transcript at 204.* McWilliams was not an ERISA employee, however when the contract was made.

During 1991 and 1992 Mr. and Mrs. McWilliams experienced serious health problems. Mr. McWilliams had two heart attacks and open heart surgery. Mrs. McWilliams had breast cancer and a mastectomy.

In 1992 the Financial Standards Board promulgated Financial Accounting Standards [hereinafter FAS] which changed how self-insured medical plans accounted for the cost of retiree medical benefits. Under <u>Financial Accounting Standards No. 106:</u> <u>Employers' Accounting for Post Retirement Benefits Other Than</u> <u>Pensions</u> (1990),[7] employers were required to reflect on their

_____

[7] <u>Financial Accounting Standards No. 106</u> took effect December 15, 1992. It "requires employers to adopt accrual accounting to expense accumulated benefits during employees' working careers rather than the past practice of waiting until the benefits are actually paid. While the change does not represent reductions in cash flow, it dramatically erodes estimates of net worth and pre-tax earnings as employers recognize

balance sheets the present value of the estimated future costs for retirees' medical benefits.  This switch was a one-time change for bookkeeping purposes only.

AMI commissioned the Wyatt Group, Inc. [hereinafter Wyatt] to study and document the financial impact of Rule 106. Using the Wyatt analysis as a starting point AMI thereafter eliminated retirees' medical benefits in its 1993 Choice Plus Medical Plan (CMP).  Retirees were notified in July 1993, by Mr. O. Edwin French, AMI's senior vice president, their coverage would cease August 31, 1993.  They could obtain COBRA coverage thereafter for 18 months or to age 65, whichever occurred first.

On July 5, 1993, Mr. French, by letter,[8] informed Mr. McWilliams his medical insurance coverage would cease August 31, 1993.  In response Mr. McWilliams engaged the services of Lester Williamson, Jr., attorney, to represent him in the matter.  On August 5, 1993, Mr. Williamson sent a letter to Mr. French,[9] copied to Diane Martindale, concerning continued coverage for the McWilliams.  Copies of both the Diener letter and the March 4, 1991, memorandum were attached.  Neither McWilliams nor Williamson heard from either French or Martindale.  *Transcript at*

the present value of projected post-retirement benefits." <u>Wise v. El Paso Natural Gas Co.</u>, 986 F.2d 929, 932, n.3 (5th Cir. 1993), <u>cert. denied</u>, 510 U.S. 870, 114 S. Ct. 196, 126 L. Ed. 2d 154 (1993).

[8]  Plaintiff's Exhibit No. 3.

[9]  Plaintiff's Exhibit No. 4.

32. Mr. McWilliams was thereafter switched to COBRA coverage with no increase in his $303.24 premiums.[10]  *Transcript at 32.* AMI ceased COBRA coverage on the McWilliams on February 28, 1995. They have had no medical insurance since that time, having been unsuccessful in obtaining coverage elsewhere.

Plaintiffs filed suit in the Circuit Court for the Tenth Judicial District in Jefferson County, Alabama, January 31, 1995, alleging fraud and breach of contract.  The case was removed to this court March 10, 1995, based on the claim for benefits under a group health plan covered by the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001, et seq. [hereinafter ERISA].

Section 1002 of the Act sets forth in part the following:

> (1)  The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or other wise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment ... .

Section 1144(a), set forth below, states:

> [T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws

---

[10]  Mr. McWilliams was already paying full premium based on an actuarial determined cost.  *Transcript at 175-76.*

insofar as they may now or hereafter relate to any
employee benefit plan described in section 1003(a) of
this title and not exempt under section 1003(b) of this
title.

AMI subsequently filed a motion in federal court for
summary judgment, claiming plaintiffs' claims were superseded by
ERISA.   Pursuant to Howard v. Parisian, Inc., 807 F.2d 1560 (11th
Cir. 1987), its progeny, and statute, the court granted
defendant's motion for summary judgment on state law **tort**
claims.[11]   The court denied defendant's motion for summary
judgment on all other claims and invited plaintiffs to amend the
pretrial order to conform to the summary judgment order.

Plaintiffs thereafter amended the pretrial order by
adding the following paragraphs:

Plaintiffs contend that defendants were not, under
the terms of the medical plan allowing a termination of
the plan "if necessary," entitled to terminate coverage
to McWilliams and other retirees.   Defendants have not
and cannot establish that the termination was legally
or economically necessary.

Plaintiffs contend that a binding agreement was
entered by the parties to provide plaintiffs with
health and medical benefits coverage for the
plaintiffs' lifetime through Denier's [sic] letter, and

---

[11]   A careful reading of the court's order and accompanying
memorandum opinion show that the language of the order specifi-
cally limited the holding to state law **tort** claims, allowing
plaintiff to proceed on other grounds.   Counsel for plaintiffs
correctly interpreted the order and moved to amend plaintiffs'
pretrial order.   Defendants are incorrect in their assertion that
"This Court's Order and Memorandum Opinion granting in part De-
fendants' motion for summary judgment made it clear, however,
that the state law claims were preempted and that only ERISA
claims would be tried."

7

the subsequent memo from AMI's vice-president of employee benefits, and that this resulted in a vesting of those benefits under ERISA.

Plaintiffs also contend that they are entitled to relief under the doctrines of equitable estoppel and/or promissory estoppel, both of which are recognized in the body of federal common law developed under ERISA. Specifically, plaintiffs contend that representations and/or promises were made to them by defendants to the effect that, as long as the defendants' medical plans were in effect, they would have coverage until age 65 (and later that they would have coverage for life), and that they relied to their detriment on the representations and promises by first taking early retirement, and subsequently by turning down benefits with two different potential employers.  Consequently, defendants should be held to their interpretation of the plan's coverage and termination provisions. Because the defendants' failure to comply with their representations and promises resulted in several [sic] emotional distress and anxiety to the plaintiffs, and because it was foreseeable and expected that the loss of healthcare coverage would result in emotional distress to the McWilliams, plaintiffs are entitled to recover, under federal common law, damages for their emotional distress under the theory of promissory or equitable estoppel.

Finally, plaintiffs contend that, under developing federal common law, defendants' conduct in promising lifetime coverage, and then terminating that coverage, at a time when it was not necessary for the economic well-being of the defendants to terminate that coverage, and when defendants were aware that plaintiffs had relied upon the representations and/or promises and were uninsurable, constitutes such an egregious breach of their fiduciary duties under ERISA, and/or a bad faith denial of benefits under ERISA, to justify the award under ERISA of extra-contractual damages including damages for the plaintiffs' emotional distress and anxiety, as well as punitive damages.

Plaintiffs seek an injunction requiring that the defendants provide the promised coverage, restitution for the value of the coverage last [sic] since it was terminated in 1993, damages for emotional distress, punitive damages, interest, costs and attorneys' fees.

The remaining claims were tried to the court sitting without a jury August 20-21, 1996.  Mr. McWilliams testified as the first witness for plaintiffs.  Originally employed by Brookwood Hospital to organize a substance abuse division, Mr. McWilliams developed a series of treatment centers separate from the hospital.  At the time AMI acquired Brookwood in July 1981, Mr. McWilliams was president of Brookwood Recovery Centers which operated three lodges.[12]  He also served as vice-president of the parent company.

When Parkside[13] Medical Services [hereinafter Parkside] bought the AMI lodges, Parkside president Mr. William J. Mueller offered McWilliams an executive position, including health benefits, with Parkside.[14]  Although McWilliams worked with Parkside during the transition as a special consultant, he decided not to accept the offered permanent position, choosing instead to work as an independent contractor consultant. Diener's letter allowed him "the freedom to choose the things I wanted to do.  And I didn't want to work full time.  And I already had benefits."  *Transcript at 20.*  Had he known his

---

[12]  At the time of his retirement in 1987 Mr. McWilliams was responsible for the operation of the eleven lodges in the program.

[13]  Parkside is a division of the Lutheran General Health system.

[14]  Employment with Parkside would begin after McWilliams' retirement from AMI.

9

medical coverage could be terminated at the whim of defendant, he would have accepted the position with Parkside.  In 1987 the health of both plaintiffs was good.  Neither had had any serious illnesses and both were insurable.

In 1988, following his AMI retirement, Mr. McWilliams was offered the permanent post of president of the National Council of Alcoholism by Dr. Robert Sparks, Chairman of the Board.  McWilliams served as its president and chief executive officer for nine months in order to recruit someone for the job. While serving in that capacity he turned down offered Council benefits because he was paying for them for himself and his wife through AMI.  Significantly, he refused permanent employment with its attached benefits (including medical insurance coverage) in the belief his medical future was secure.  *Transcript at 22-23.* Once again, had Mr. McWilliams known his AMI benefits could be terminated he would have accepted other employment.  The record thus shows he twice refused employment elsewhere in reliance on AMI's promises.  Again, both he and his wife were in good health and insurable at the time of proffered employment.

During the period of 1991 through 1994 when both plaintiffs suffered severe illnesses[15] medical expenses were paid

---

[15]  Mrs. McWilliams had a mastectomy and follow-up treatments in 1991.  She continues with cancer follow-up screening and treatments.  Mr. McWilliams had two heart attacks in 1993, became an angioplasty patient, and underwent double bypass surgery in 1994.

by the AMI group medical plan (GMP) or its COBRA replacement for
which Mr. McWilliams paid premiums until March 1995 when AMI
refused to accept his proffered payment.  Since the expiration of
McWilliams' COBRA coverage on February 28, 1995, all of their
medical payments have been made out-of-pocket on the front end by
plaintiffs who are beleaguered with constant worry and anxiety
because they have no health care coverage and know they could
lose everything they have with the occurrence of another
catastrophic illness.  Testimony indicates Mrs. McWilliams'
treatments could run as high as $500,000.00.  *Transcript at 36-
37.*  Mr. McWilliams is currently undergoing "watchful waiting"
with a prostate problem which will eventually require surgery.
Neither will be eligible for Medicare for some time:  Mrs. Mc-
Williams on October 7, 1999, and Mr. McWilliams on August 4,
1997.

      Mr. French, presently president of French & French in
Dallas, Texas, a health care consulting firm, was employed by AMI
from January 1992 through April 1, 1995, as senior vice-president
of human resources.  It was his job to cut $107,000,000.00 out of
the budget in five years' time through cost cutting in areas of
health benefits and time-off benefits in order to fulfill a
promise made by the former administration to investor analysts on

11

Wall Street.[16]  *Transcript at 79-80.*  FAS 106, previously
discussed, was put into effect during his tenure.  French ac-
knowledged FAS 106 affected the net pre-tax profile for purposes
of calculating earnings per share, but that it did not affect the
cash.  *Transcript at 98.*  It did not change the cash AMI was
paying for health care benefits.  *Transcript at 98.*  Under Mr.
French's direction and upon his recommendation that AMI cease
funding retiree insurance beyond 1993, the AMI compensation com-
mittee[17] decided not to fund the retiree health insurance because
of FAS 106.  *Transcript at 88-89; 117.*  The board accepted the
committee recommendation.  *Transcript at 90.*

Of interest is that, while denying medical benefits to
approximately "seventy-two participants under the age of sixty-
five," (*Transcript at 181*), in September 1993, AMI granted
bonuses in excess of $16,600,000.00, (*Transcript at 134*), to over
30,000 employees for 1993, indicating the decision to discontinue

---

[16]  The defendant had promised Wall Street analysts it would
make cost cutting changes to get the best bottom line--hence best
possible multiple for an evaluation--to facilitate the most
favorable friendly or unfriendly merger.  The changes were not
prompted from any kind of "necessity," but from greed.

[17]  Mr. Robert O'Leary, CEO, served on the committee as well
as Mr. French who served as the staff member on the board of
directors.  The committee was comprised mostly of outside direc-
tors responsible for reviewing the compensation and major
benefits of the company.  The committee approved the benefits
plans, designs, and funding.

retiree medical benefits was not necessary to the financial
integrity of the company.

Under cross-examination Mr. French testified that had
AMI perceived the retirees had written documents guaranteeing
health insurance benefits it would have been honorably bound to
uphold them. *Transcript at 101-102.* He had never seen the
Diener letter at the time the decision to terminate retiree
medical benefits was made. *Transcript at 95.* Mr. French did say
AMI honored one or two agreements with retirees. *Transcript at
100.* "I think any honorable company that has a legally binding
contract with somebody has to abide by that contract and **we would
certainly do that** (emphasis added)." *Transcript at 102.* No
consideration was given to retirees who were unable to get health
coverage. *Transcript at 130.*

Witness Diane Martindale became director of benefits
with AMI in 1991. As administrator of its medical plan she was
involved in the 1993 analysis terminating retirees' medical
coverage, working with Wyatt. She testified that the "cut" was
**not necessary** to the economic viability of the company, but was
made to prevent the additional costs from showing on the
financial statement for the Wall Street analysts. The overall
program was to improve short term viability in order to remain
competitive. *Transcript at 152.*

13

Ms. Martindale testified that at the time the Diener letter went out a plan document, which had **no reservation of rights,** (*Transcript at 158*), was in effect.[18]  McWilliams was not in the plan at this time.  On inquiry he was told this letter applied to him.  He relied on this representation which was in fact an offer.  His reliance led to retirement (and detriment which constituted a consideration), and upon retirement he became covered by the plan, by agreement.

The language of the Diener letter was broader than the ERISA plan because it covered both plan employees and non-plan employees.  It was therefore applicable to McWilliams in two respects: 1) it created a contract with him outside of ERISA; and 2) since it was funded by putting Mr. McWilliams in an ERISA plan upon his retirement, all previous representations interpreted the plan--interpretations binding upon AMI.

Pertinent language in the 1980 plan,[19] at 1, reads as follows:

### I. PLAN DOCUMENT

This instrument contains the provisions of the Medical Benefits Plan (Plan) for employees of American Medical International, Inc. (Company) and its participating subsidiaries.  This instrument is the "Plan Document" as defined in the Employee Retirement Income Security

---

[18]   Ms. Martindale found the document in storage some time after being asked to produce it.  The document **was not** produced as per the court's discovery order; in fact, not until trial.

[19]   Defendant's Exhibit No. 8.

14

Act of 1974.  The Plan is administered and benefits are payable solely in accordance with the provisions of this instrument.  **In event of conflict with any other document, booklet, plan description or other materials relating to the Plan, this document shall govern** (emphasis added).

. . .

TERMINATION OF COVERAGE[20]

The coverage of an employee and his dependents will terminate if the individual ceases to be an eligible employee or if the Plan should be discontinued.

Under 29 U.S.C. § 1002(6) the term "employee" is defined to mean any individual employed by an employer.  This language is further amplified by § 1002(7), set forth below:

The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

Any ambiguity as to the meaning of "*eligible employee*" was resolved by the Diener letter which interpreted benefits to cover retirees.  No further mention is made in either the "Plan" or Diener's interpretation of that "Plan" as to whether "*eligible employee*" meant someone who was currently employed or who had taken retirement status.  Diener's letter clearly states retiring employees are covered, thus interpreting the ambiguous provision. In any event, at the time Diener's letter was sent, Mr.

---

[20]   Found in Defendant's Exhibit No. 3, III. C, at 3.

15

McWilliams was an "employee" who became a "participant" in the plan upon retirement.[21]

The 1980 plan was not terminated until December 1995. At the time she participated in termination of retirees' medical benefits, Ms. Martindale was aware of the Diener letter, which she classified as "an announcement of the benefit changes." *Transcript at 154.* She testified there was **no reservation of rights in the letter,** *(Transcript at 156)*, and she was aware of the company's position giving retired board members health insurance for life.[22] She was aware of Plaintiff's Trial Exhibit 2, a March 4, 1991, AMI Memorandum [hereinafter Hwee memo] to Claims Examiners from Joyce Hwee, Health Claims Manager, in reference to "ADDITION TO CLAIMS HISTORY" of executives and AMI directors. Mr. McWilliams is listed, along with his Social Security number.[23] The Hwee memo evidences the existence of the Diener/McWilliams contract. Pertinent memo language follows:

---

[21] Mr. McWilliams was an employee when he read the letter. He was a retiree when it applied.

[22] Ms. Martindale testified that the number of executives or directors who had the life benefit was 27. *Transcript at 163; 166-167.*

[23] The witness testified Mr. McWilliams' name was placed on the list by error. Lifetime coverage was only granted directors. Although Ms. Martindale was aware the letter erroneously included the executives, neither she nor the company ever made any effort to correct the document or recall it.

For your reference, below is a list of the Executives
and their Social Security numbers, who have had the
following added to their claims history:

"Medicare will be a secondary payor to the American
Medical International Health Benefits Plan.  This
individual is a retired AMI Director or other Senior
Executive, and is entitled to this coverage.  Choice-
Plus Medical coverage will not expire for this
individual even if he or his eligible dependents are 65
years of age or older and entitled to be covered under
Medicare."

Ms. Martindale further testified there was some
discretion on her part to continue health coverage past age 65.
*Transcript at 165.*  She probably never told Mr. French about the
Diener letter and has no knowledge of whether the board
considered the letter when the decision was made to cut health
benefits for retirees.  Importantly, Martindale testified AMI did
provide coverage for some retirees.  Pertinent testimony follows:

Q    Am I correct that there were, I don't know, three,
five, something like that, people that y'all decided to
go ahead and provide coverage?

A    There were.  Evidence was produced.  One of them
was an *early retirement letter* from one of our
hospitals in Omaha where they had actually put in
writing back in '91 or '92 a memo to some managers that
they wanted to take early retirement and they told the
managers that if they would take early retirement, they
would provide medical coverage for them to age sixty-
five.

So we felt that we were obligated to honor that.
There was another executive that had a written
termination agreement.  And in that written termination
agreement he was told that he could continue the same
coverage as other active executives until the point
that he received other group coverage.  As far as I
know today he hadn't received other group coverage.  He
has gone into business for himself and hasn't provided

17

it.  So because of that termination agreement we continued his medical coverage under the plan.

Q    The first people was a letter from, they got a letter from a *hospital administrator*?

A    As part of their early retirement inducement, they were given a letter in writing from the *hospital administrator*.

Q    Which said that they would have medical coverage?

A    Basically said that -- I don't remember how it was worded, but basically it said you will have medical coverage, actually paid for by that hospital to age sixty-five.

Q    And am I correct that all those people were essentially, prior to, at least, the termination in '93, they were just provided coverage under the regular group medical plan subject to all the deductibles and whatnot that went on?

A    Yes.

Q    And when those deductibles or co-pays change, they were subject to those as well?

A    Yes, yes.

Q    And there is no provision in the plan as y'all amended it to pay those people, am I correct, they don't fall within any of the eligibility requirements?

A    Other than the continuation of coverage under COBRA.

Q    I was going to ask you about that.  Is that how you are paying them, continuation of coverage under COBRA?

A    Actually, yes, that is how we are paying them, I believe.  That is how we were administratively handling them at that time.  I am not sure how they are handled today.

Q    You paid the other people eighteen months, you
offered all the early, the other early retirees
eighteen months?

A    Yes.

Q    And you are paying these other people
indefinitely?

A    No, it was to age sixty-five.

Q    But ever however months that is, you're going to
cover them under Cobra (as written in transcript)?

A    For those individuals, yes.

Q    Is that permitted to provide longer COBRA coverage
than is required?

. . .

Q    Let me ask you, under your understanding as the
administrator of the plan, is that permitted?

A    My understanding is that the COBRA regulations set
out minimum standards under which you have to offer
coverage.  There is nothing under the COBRA provisions
that prevents you from offering additional coverage.

    We had made the decision at the time that we
discovered that these employees were -- actually had in
writing something saying, something that we felt was a
contract, then we felt that we could, through
administrative discretion, expand COBRA to cover those
people who had contracts in writing, to provide medical
coverage to age sixty-five if those contacts were in
place prior to our decision to eliminate the early
retiree coverage.

Q    At least some of these things y'all felt to be
contracts were letters from a hospital administrator?

A    They were agreements between the hospital and the
employee.

. . .

Q    But it is clear, though, and you would agree with
me that whether it was a memo or a written formal

19

contract that says contract signed by all the parties
or whatever, they were not plan documents?

A    I agree they were not plan documents.

Q    Okay.  And you as the administrator or as one of
the administrators of the plan felt that even though
those were not plan documents that they had somehow
modified the plan so that y'all were obligated to
provide coverage?

A    I did not feel that they had modified the plan so
that we were able to provide coverage.  I felt like
they showed a contractual obligation for us to provide
coverage for these people.  And so we did under the
covered provisions of the plan.

Q    Let me ask you this.  You may not know.  Do you
know how under FAS 106 you're accounting for those?

A    Actually under FAS 106 you have to account for the
retirement benefits, not for COBRA benefits.

Q    Okay.  So by paying it as COBRA rather than
retirement benefits, you don't run into the problem of
having to do the cost accruals and everything?

A    That is my understanding.

Q    You simply just -- you expense it as it's
incurred?

A    Correct.

Q    You could have done the same thing with Mr.
McWilliams, could you not?

A    We did for eighteen months.

Q    And you could have done it after eighteen months
under your administrative discretion?

A    Our administrative discretion we didn't really
want to open up beyond what we felt we had to open up.
And so we restricted it to those people who had
contractual agreements prior to the date the decision
was made.

20

*Transcript at 168-173 (emphasis added).*

Further in her testimony Ms. Martindale testified to the following:

Q    I think you testified earlier that the company felt it was appropriate to make payments to two or three individuals who had contracts -- tell us why did the company feel it was appropriate to make payments to those individuals.

A    We felt like, well, we had basically two reasons. The primary reason was we felt like we had a contract with these employees.  We had been, we had, in essence, we, the company, had given them medical benefits to age sixty-five in exchange for their agreeing to take an early retirement.

The second thing was because we induced them to take the early retirement through that, we felt we were doing the right thing, that we should honor our commitments.

Q    And I think this morning you may have used the word consideration?

A    Right.

Q    Was consideration given by these employees who were allowed to continue their coverage?

. . .

Q    Did you personally consider that these employees had exchanged something for the early retiree benefits that they were afforded?

A    I felt that they gave up continued employment with the company to receive those benefits.

Q    And who was it that actually made the decision that these employees would be able to continue to receive their coverage?

A    I am trying to remember.  I think it went to the benefits committee, Ed French, Mike Murdock and myself. We had it reviewed by our outside E.R.I.S.A. attorney

21

to make sure we could do that.  And we decided we had
an obligation we had to honor, and we did that.

*Transcript at 195-197.  See also Transcript at 171*, previously

cited.  The committee used its "administrative discretion, [to]

expand COBRA to cover those people...."

The defendant called Steve Erickson, actuary with

Watson Wyatt Worldwide[24] in Dallas, who performed the study

designed to measure the cost of the retiree medical program in

accordance with FAS 106.  Wyatt provided demographic, or

participants, census data (listing of all employees currently

employed and retirees eligible for retiree medical coverage), and

information concerning the amount of claims paid under the

company's medical benefits program.  Mr. Erickson, as actuary,

signed the report in connection with the valuation of AMI's

retiree medical plan.  He testified the conversion affected by

FAS 106 affected the net income or profit and loss statement,

along with the balance sheet.  *Transcript at 237.*  Mr. Erickson

testified there were two accounting options available under FAS

106:  "The employer had the option of recognizing the entire

amount as a onetime extraordinary charge to earnings in the year

of adoption," or amortizing it over twenty years.  *Transcript at

238.*  In discussing the effect of that option the witness had the

following to say:

_____

[24]  Successor to Wyatt Company.

22

[O]ne of the purposes of FAS 106 cost is to take this rapidly growing obligation and convert it in to a more level incurrence of the expense amounts.

So there is a shifting of future costs into the current year.

The other part is, we are reflecting in the FAS cost which is not reflected in the current cash cost, the expected future claims payable to the current active employees.

I should amend that to say expected future paid claims as a retiree of current active employees.

*Transcript at 242.*

Mr. Erickson acknowledged that the Wyatt assumption regarding future medical trend rates was too high. *Transcript at 246.* Consequently Wyatt reduced its initial trend assumption from 14 percent to 10 percent which, in turn, reduced the numbers in the report. *Transcript at 247.* The reduction from 14 to 10 percent reduced both the extraordinary charges as well as the recurring cost. *Transcript at 252.* Although statistics and history have proven that even the 10 percent figure was too high, Wyatt eventually went back to the 14 percent because AMI wanted the **one time charge** on the report to be **as large as possible**-- concededly a more graphic impact. *Transcript at 257-58.* This gross distortion of the future medical trend can only be interpreted as AMI's effort to "cook the books" for its own selfish purposes. It was no longer interested in the 20 year amortization and its effect on dramatically lowering the expense statement in the first year FAS 106 was to apply (and

23

consequently increasing stated earnings compared with a large one-time charge in that year). *Transcript at* 257-58.

During questioning Mr. Erickson acknowledged the "*extraordinary*" charge would have normally been footnoted on the financial statements as an extraordinary item, *(Transcript at 24),* noting what the extraordinary expense charge was and why it was not an operating expense. *Transcript at 254.* As such the "*extraordinary*" charge--a charge understood by seasoned investors--would not have affected the value of the company in the eyes of anyone valuing the stock for the purpose of a buyout or merger, friendly or unfriendly.

## ISSUES

On the basis of these facts the court has directed its attention to the following issues:

1) Does ERISA preempt plaintiffs' claims?

2) Was AMI entitled to terminate medical benefits for the McWilliams?

3) Do the plaintiffs have a cause of action for simple breach of contract against AMI pursuant to the contract law of the State of Alabama?

4) Do the plaintiffs have a cause of action against AMI for breach of a contract created by equitable or promissory estoppel, or the principles of Restatement, Contract § 90, or pursuant to the contract law of the State of Alabama?

5) Is AMI liable for the emotional distress and anxiety the McWilliams experienced as the result of their health care's being terminated?

24

6) Was AMI guilty of breach of its fiduciary duties under ERISA or otherwise liable to the plaintiffs under ERISA?

7) Should the defendant be ordered to restore coverage for the McWilliams?

8) Should AMI pay restitution for the value of the McWilliams' coverage since it was terminated?

9) Are the McWilliams entitled to punitive damages, interest, costs, and attorneys' fees?

## SIMPLE CONTRACT

As indicated in the summary judgment order and opinion, the court left the issue of breach of contract open. The detailed enumerated facts establish the Diener letter was never withdrawn or modified and that Mr. McWilliams relied on it in making his decision to take early retirement. Thus, this discussion is not one of ERISA at all, much less one of plan amendment. It focuses on the creation of a contract, the same as if we were discussing an instrument signed by both parties.

The formation of a simple contract involves three things: an offer, an acceptance, and consideration--elements discussed in the introductory chapter of all contract treatises and during the first days of "Contracts I" taught in all law schools. Paul R. Conway, Outline of the Law of Contracts, "Chapter I Introductory," [hereinafter Conway] at 7-8 (1968) defines contract in the following manner:

A.  CONTRACT DEFINED:  **A contract is a legally binding promise or set of promises.**  It has also been variously defined as:

   (1)  "A bargain or agreement voluntarily made upon good consideration, between two or more persons capable of contracting, to do, or forbear to do, some lawful act." Justice v. Lang, 1870, N.Y. 497, citing Comyn on Contracts.

   [2]  "A voluntary and lawful agreement, by competent parties, for a good consideration, to do or not to do a specified thing." Robinson v. Magee, 1858, 9 Cal. 81 at 83.

   (3)  "An agreement upon sufficient considera- tion to do, or not to do a particular thing." Blackstone's Commentaries, vol. 2, page 11.

   (4)  "A promise, or set of promises, to which the law attaches legal obligation." Williston on Contracts, § 1.

   (5)  "A promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement of Contracts Second, § 1.

B.  PROMISE: PROMISOR: PROMISEE: BENEFICIARY

   "(1) A promise is a manifestation of inten- tion to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.

   "(2) The person manifesting the intention is the promisor.

   "(3) The person to whom the manifestation is addressed is the promisee.

   "(4) Where performance will benefit a person other than the promisee, that person is a beneficiary." Restatement of Contracts Second, § 2.

26

Conway later defines and lists components of consideration.  "Chapter V Consideration," at 147-48.

I.   **CONSIDERATION DEFINED. Either the slightest legal detriment suffered by one party at the request of the other or the slightest legal benefit bargained for and obtained by either party, will constitute a consideration sufficient to support a contract.**

Consideration in unilateral contracts may take the form of (1) an act, (2) a forbearance, or (3) the creation, modification or destruction of a legal right.  A return promise is consideration in bilateral agreements.

## CONTRACT BY PROMISSORY ESTOPPEL

Closely aligned with basic contract law is the law of promissory estoppel--an independent basis for creation of a contract.  This discussion of contract is not connected with ERISA at all or with amendment procedures of an ERISA plan document.  In chapter 8.11, entitled "The Four Stages in the Evolution of Promissory Estoppel," at pages 40-41, Corbin notes that historically equity enforced "promissory estoppel" before bargained-for consideration was conceived.  In Mazer v. Jackson Ins. Agency, 340 So. 2d 770, 772 (Ala. 1976), the Alabama Supreme

27

Court explained the purpose of both equitable[25] and promissory[26] estoppel[27] in the following manner:

> (The purpose of both) is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience.

A basic aspect of promissory estoppel is a **detriment** suffered by the aggrieved party who **relied** on the promise to his detriment. *See* Words and Phrases, "Promissory Estoppel." The detriment aspect is essential to promissory estoppel. <u>Robert Gordon, Inc. v. Ingersoll-Rand Co.</u>, 117 F.2d 654, 660-661 (C.C.A

---

[25] <u>Mazer</u>, 340 So. 2d at 772, uses the definition of equitable estoppel found in 21 C.J. § 120 pp. 1117-18, which follows: "Equitable estoppel is 'based upon the ground of public policy and good faith, and is interposed to prevent injustice and to guard against fraud by denying to a person the right to repudiate his acts, admissions, or representations, *when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence.* The doctrine of estoppel is far reaching in its effect, extending to real as well as personal estate, and embracing almost every enterprise in which men may be engaged.' (Italics supplied.)"

[26] <u>Mazer</u>, 340 So. 2d at 772-73, uses the definition of promissory estoppel found in <u>Bush v. Bush</u>, 278 Ala. 244, 245, 177 So. 2d 568, 578 (1964), which follows: "'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'"

[27] Williston states the doctrine of promissory estoppel is "distinct from the ordinary equitable estoppel, since the representation is promissory, not a misstatement of an existing fact." 3 Williston on Contracts, sec. 689.

7 1941) (Justifiable reliance and irreparable detriment to the
promisee are requisite factors among others necessary to enable
promisee to rely upon the doctrine of "promissory estoppel.).

The defendant has erred in its denial that there was
"consideration" in the case at bar.  Consideration can be a
detriment suffered.  Bryan A. Garner in <u>A Dictionary of Modern
Legal Usage</u> (Oxford U.P. 2d ed. 1995), defines the term in its
legal sense in the following manner:

> This word (consideration) is one of the lawyer's basic
> TERMS OF ART, but even lawyers sometimes misconceive
> the word: "One must be careful not to think of
> '*consideration*' as if it was synonymous with
> '*recompense*'; rather the word [at common law] connoted
> some *sound reason* for the conveyance, and the payment
> of money by the feoffee was only one possible reason."
> A.W.B. Simpson, <u>An Introduction to the History of the
> Land Law</u> 167 (1961; repr. 1964).

At 206.  *Consideration* includes some "forbearance, detriment,
loss, or responsibility, given, suffered, or undertaken by the
other."  <u>BLACK'S LAW DICTIONARY</u> 306 (6th ed. 1990).  Mr.
McWilliams suffered a detriment in the form of lower income by
taking early retirement in the belief he would have medical
coverage.  He suffered further detriments by twice refusing other
proffered employment with accompanying health care benefits.

Even so, the law recognizes contracts made without
consideration.  Conway, "Chapter VI Contracts Without
Consideration," at 247-249 (1968), develops the general rule of

the use of promissory estoppel as a substitute for consideration in the following manner:

- A.  GENERAL RULE:  **A promise lacking mutual assent and not supported by consideration will be enforced:**

    - **(1)  Where a promisor makes a definite promise which he expects or reasonably should expect will induce action or forbearance of a substantial sort on the part of the promisee,** and

    - **(2)  Where the promise in fact induces such action or forbearance of substantial character,** and

        - (A)  NOTE:  Prior to such reliance the promise can be withdrawn.[28]

    - **(3)  Where injustice can be avoided only by enforcing the promise.**

- B.  DISTINGUISHED FROM ESTOPPEL.  Ordinary estoppel is a misrepresentation of **existing fact,** which the misrepresentor knew, or reasonably should have known, would mislead the other party, and which does mislead him to his damage.  In promissory estoppel, the only **fact** represented is, possibly, that at the time the promisor made the promise he intended to fulfill it.  If true, as is usually the case, there is no misrepresentation.  Even if untrue, it is not the untruth of the promisor's original **intention** which injures the promisee, but the **promisee's reliance upon the promise itself.**

Foreseeable, justifiable reliance leading to a detriment is essential in a promissory estoppel case.  In <u>Times-Mirror Co. v. The Superior Court</u>, 3 Cal. 2d 309, 44 P.2d 547 (1935), the city of Los Angeles was estopped by its conduct from abandoning condemnation proceedings upon which the paper had

---

[28]  The promise was never withdrawn in the case at bar.

relied in buying and building its new plant.  The four elements of promissory estoppel were present:  1) an express promise to do something; 2) reasonably foreseeable likelihood that the recipient of the promise would rely thereon; 3) justifiable and material reliance; and 4) inevitable injustice resulting unless the promise was enforced.

In determining whether the detriment suffered in reliance on the promise is sufficient to make the promise enforceable, Corbin, at 26, poses the following questions:

1) Was the conduct of the promisee actually induced, in part or in whole, by the promise?

2) Was the action or forbearance substantial, constituting a material change of position by promisee?

3) Did the promisor desire or request it, even though not offering the promise in exchange for it?

4) Did the promisor have reason to foresee such action or forbearance as a probable result of the promise?

5) Was the promised performance costly or difficult?

6) What ratio does the cost or value of the conduct in reliance bear to that of the promised performance?

7) In the light of the answers to the foregoing questions, what remedy, if any, will be just and equitable?  Should it be (1) *Full Money Damages*, measured by the value of the promised performance and the foreseeable injury resulting from non-performance (expectation damages), or (2) *Restitution*, measured by the promisor's own unjust enrichment, or (3) *Reliance Damages,* reimbursement of the expenditures and losses incurred by the promisee with the value of the promised performance the maximum that is recoverable, or *Specific Performance*?

The historical development of equitable estoppel has seen the doctrine used in four stages:  1) an estoppel stage (to promote equity and justice); 2) a contract stage (courts applying promissory estoppel as a consideration substitute to validate and enforce promises and awarding contractual expectation damages); 3) tort stage (independent of contract centering on promisee's right to rely); and 4) equity stage (used during 1980's and 1990's to rectify wrongs with corrective relief).  Corbin at 45-58.

The Fifth Circuit, in <u>Nimrod Marketing (Overseas) Ltd. v. Texas Energy Investment Corp.</u>, 769 F.2d 1076, 1080 (5th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1047, 106 S. Ct. 1266, 89 L. Ed. 2d 575, and <u>cert. denied</u>, 476 U.S. 1104, 106 S. Ct. 1948, 90 L. Ed. 2d 357 (1986), stated the following:

> Promissory estoppel is an equitable form of action in which equitable rights alone are recognized.

According to Corbin, at 57, the primary equitable right is the promisee's right to rely.  In his discussion of equitable estoppel, Corbin further stated:

> With their reliance sabers, courts award the full range of remedies based on specific performance, restitution, expectation, reliance, exemplary (seldom),[29] or some other appropriate relief to achieve corrective justice between the parties in the context of their distinct litigation.

Corbin at 57.

---

[29]  <u>Greenstein</u> v. <u>Flatley</u>, 19  Mass. App. Ct. 351, 358, 474 N.E.2d 1130, 1134 (1985) (Court applied promissory estoppel to award both punitive damages and expectation damages of equal amount regarding an office lease).

As he examined the equitable estoppel doctrine Corbin

referred to <u>Hoffman v. Red Owl Stores</u>, 26 Wis. 2d 683, 701-02,

133 N.W. 2d 267, 276-77 (1965), a portion of which is set forth

below:

> Where damages are awarded in promissory estoppel ...,
> they should be only such as in the opinion of the court
> are necessary to prevent injustice.  ...  In determin-
> ing what justice requires, the court must remember all
> of the powers, derived from equity, law merchant, and
> other sources, as well as the common law.  Its decree
> should be molded accordingly.

<u>Id.</u>

Corbin noted that several imponderables should be taken

into consideration in reaching a just decision.

> When a plaintiff's recovery is predicated on findings
> of a promise and detrimental reliance thereon, there is
> no fixed measure of damages to be applied to every
> case.  Rather, the amount of damages should be tailored
> to fit the facts of each case and should be only that
> amount which justice requires.

<u>Id.</u> At 58.

The equitable principle of promissory estoppel, as

outlined above, has long been recognized in Alabama.  <u>Johnson v.</u>

<u>Blair</u>, 132 Ala. 128, 31 So. 92 (1901).  In 1976 in <u>Mazer v.</u>

<u>Jackson Ins. Agency</u>, 340 So. 2d 770 (Ala. 1976), the Alabama

Supreme Court opined that an offer is not the basis of promissory

estoppel unless there is foreseeable detrimental reliance upon

it.  The court stated:

> An express promise is not necessary to establish a
> promissory estoppel.  It is sufficient that there be
> promissory elements which would lull the promisee into
> a false sense of security.

33

340 So. 2d at 774.

In another context Alabama courts have used promissory estoppel as an independent equitable theory of relief for granting reliance damages. <u>Graddick v. First Farmers and Merchants National Bank of Troy</u>, 453 So. 2d 1305, 1310 (Ala. 1984) (referred to elements of promissory estoppel as stated in Dobbs, Remedies § 2.3 (1973)).

It is emphasized that this entire discussion has nothing whatever to do with ERISA, nor with estoppel cases having to do with amendment of an ERISA plan by estoppel. In this discussion we are considering the creation of a non-ERISA state-law contract between parties not even bound by an ERISA plan. McWilliams, while employed by defendant, was never covered by an ERISA plan. By the time he retired, his reliance was sufficient to have caused a common law contract to have been formed under Alabama law.


## CONTRACT BY RESTATEMENT (SECOND) OF CONTRACTS

A third type of contract is one that moves beyond promissory estoppel in an effort to avoid injustice through the use of Restatement (Second) of Contracts § 90 language. Although section 90 includes estoppel it is not entirely or solely an estoppel doctrine, for section 90 does not always require consideration, a promise, a misrepresentation of an existing

fact, or reliance on such, nor even an intention not to keep a
promise.  The bid cases, discussed below, provide a good example
of how section 90 can and does extend beyond traditional
principles of promissory estoppel.  As the discussion shows,
Alabama has embraced first, traditional promissory estoppel
principles and also section 90's extension and broadening
effect.[30]  Since 1976 Alabama has incorporated Restatement
(Second) of Contracts § 90, as part of its evolving common law.
See Cantrell v. City Federal Sav. & Loan Ass'n, 496 So. 2d 746,
751 (Ala. 1986) (quoted and applied Restatement (Second) of
Contracts § 90(1)).  Alabama has applied the doctrine as a
consideration substitute for awarding expectation damages.  See
Pinkston v. Hartley, 511 So. 2d 168 (Ala. 1987) (easement by
estoppel); Smith v. Norman, 495 So. 2d 536 (Ala. 1986); Mazer v.
Jackson Ins. Agency, 340 So. 2d 770, 772 (Ala. 1976).

     In establishing whether the Diener letter formed a
third type of contract with Mr. McWilliams the court has
therefore turned to the RESTATEMENT (SECOND) OF CONTRACTS § 90
(1981), set forth below, published by the American Law Institute.
"The Institute's purpose was to clarify, simplify and make
contract law more certain by stating precisely and clearly the
principles and rules of the common law in light of court

---

[30]    See footnote 33.

decisions."   3 Eric Mills Holmes, Corbin[31] on Contracts § 8.10

entitled "Restatement (Second) of Contacts § 90 and Other

Sections Adopting the Conduct in Reliance Doctrine" (Joseph M.

Perillo, ed. Revised Edition 1996) [hereinafter Corbin] at 35.

     The Restatement section uses the following language:

> (1)  A promise which the promisor should reasonably
> expect to induce action or forbearance on the part of
> the **promisee or a third person** and which does induce
> such action or forbearance is binding if injustice can
> be avoided only by enforcement of the promise.  **The
> remedy granted for breach may be limited as justice
> requires** (emphasis added).

RESTATEMENT (SECOND) OF CONTRACTS § 90.  Promise Reasonably

Inducing Action or Forbearance (1981).[32]

     Comments to the Restatement further state:

>    b.  *Character of reliance protected.*  The
> principle of this Section is flexible.  The promisor is
> affected only by reliance which he does or should
> foresee, and enforcement must be necessary to avoid
> injustice.  Satisfaction of the latter requirement may
> depend on the reasonableness of the promisee's
> reliance, on its definite and substantial character in
> relation to the remedy sought, on the formality with
> which the promise is made, on the extent to which the
> evidentiary, cautionary, deterrent and channeling
> functions of form are met by the commercial setting or
> otherwise, and on the extent to which such other

---

[31]  Arthur L. Corbin acted as "Consultant" to the ALI in its
pursuit.  He approved the revisions to Section 90 of the Re-
statement.

[32]  Section 90 is distinguished from ordinary estoppel ("a
misrepresentation of an **existing fact**, which the misrepresentor
knew, or reasonably should have known, would mislead the other
party," and did, in fact, do so).  In a section 90 type situation
"it is not the untruth of the promisor's original intention which
injures the promisee, but the **promisee's reliance upon the
promise itself.**"  Conway, "Chapter VI Contracts Without Consider-
ation," at 248 (1968).

policies as the enforcement of bargains and the
prevention of unjust enrichment are relevant.   ...

   d. *Partial enforcement*.  A promise binding under
this section is a contract, and full-scale enforcement
by normal remedies is often appropriate.   ...

   e. *Gratuitous promises to procure insurance*.  This
Section is to be applied with caution to promises to
procure insurance.  The appropriate remedy for breach
of such a promise makes the promisor an insurer, and
thus may result in a liability which is very large in
relation to the value of the promised service.   ...
Such difficulties (reliance or promise to use reason-
able efforts) may be removed if the proof of the
promise and the reliance are clear, or if the promise
is made with some formality, or if part performance or
a commercial setting or a potential benefit to the
promisor provide a substitute for formality.

RESTATEMENT (SECOND) OF CONTRACTS § 90 cmt. b, d, and e (1981).


   Corbin at chapter 8.2, at 8, points out that section

90, a doctrine for reliance on a promise, is consistent with both

historical development and current definitions (title of

section).[33]  Under this doctrine "[c]onsideration is something

done, forborne, or suffered, or promised to be done, forborne,

---

   [33]    The principle enunciated in section 90 has long been
recognized in Alabama jurisprudence.  <u>Mazer</u>, 340 So. 2d at 773
(referring to <u>Johnson</u> <u>v.</u> <u>Blair</u>, 132 Ala. 128, 31 So. 92 (1901)).
<u>Mazer</u> quotes the definition of promissory estoppel (section 90)
found in <u>Bush</u> <u>v.</u> <u>Bush</u>, 278 Ala. 244, 245, 177 So. 2d 568, 578
(1964).  By defining promissory estoppel as being covered within
section 90 language <u>Mazer</u> is thus both a promissory estoppel case
as well as a section 90 one.  <u>Mazer</u> stands for the principle of
promoting equity and justice in instances in which the conduct
estopped is both inequitable and unjust.

or suffered by the promisee in respect of the promise."[34] Historically in assumpsit actions courts have been familiar with the idea of reliance on a promise as a reason for enforcement. Corbin, at 9 n.2, directing attention to James Barr Ames, History of Assumpsit, 2 Harv. L.R. 1, 53 (1889).

Furthermore, in chapter 8.3, at 9, Corbin states: "It is now quite clear that an informal promise may be enforceable by reason of action in reliance upon it, even though that action was not bargained for by the promisor and was not performed as an agreed exchange for the promise." Corbin goes further to state that "a promise may become enforceable by reason of reliance by a third party beneficiary or others as well as by the promisee,"[35] language significant in the context of Mrs. McWilliams' claim in the case at bar.

Succinctly stated:  Section 90 replaces the need for consideration with detrimental reliance.  Corbin sees no conflict with the necessity for consideration and its evolution into section 90.

The bid cases exemplify contracts formed within the framework of this doctrine.

-----

[34]  This statement "used by Sir William Anson in his work on Contracts is taken chiefly from an opinion in the case of <u>Currie v. Miss</u>, L.R. 10 Exch. 162 (1875)."  Corbin, at 8 n.2.  The quoted material in the body of the opinion is found in Corbin § 8.2 at pg. 8.

[35] Chapter 8.10 at 36.

In <u>Janke Construction Co., Inc. v. Vulcan Materials
Co.</u>, 386 F. Supp. 687 (W.D. Wis. 1974), <u>aff'd</u>, 527 F.2d 772
(1976), the court held that the doctrine of promissory estoppel
is applicable to construction bid cases in order "to avoid
injustice." 389 F. Supp. at 697. The court stated: "'It is only
right and just that a promise a promisor knows will induce action
of a substantial character be enforced if it is in fact relied
on.'" <u>Id.</u> at 684 (quoting <u>E.A. Coronis Associates v. M. Gordon
Construction Co.</u>, 90 N.J. Super. 69, 216 A.2d 246, 251 (1966)).
<u>Janke</u>, at 694 refers to <u>Drennan v. Red Star Paving Company</u>, 51
Cal. 2d 409, 333 P.2d 757 (1958), as the best expression of the
rationale for application of promissory estoppel in construction
bid cases. In <u>Red Star</u> a subcontractor (defendant) used an oral
bid for work on a school project on which the general contractor
(plaintiff) was bidding. Since the defendant's bid was the
lowest the plaintiff used that bid in submitting his bid on the
project. Although plaintiff was the successful bidder the
defendant informed him the next day that it would not do the work
at the quoted price. In using promissory estoppel to prevent the
defendant from revoking its stated bid the California Supreme
Court in <u>Red Star</u>, 333 P.2d at 760, stated the following:

> " ...The very purpose of section 90 is to make a
> promise binding even though there was no consideration
> 'in the sense of something that is bargained for and
> given in exchange.' (See 1 Corbin, Contracts 636 et
> seq.) Reasonable reliance serves to hold the offeror
> in lieu of the consideration ordinarily required to
> make the offer binding.

. . .

> "When plaintiff used defendant's offer in
> computing his own bid, he bound himself to perform in
> reliance on defendant's terms.  Though defendant did
> not bargain for this use of its bid neither did
> defendant make it idly, indifferent to whether it would
> be used or not.  On the contrary it is reasonable to
> suppose that defendant submitted its bid to obtain the
> subcontract.  It was bound to realize the substantial
> possibility that its bid would be the lowest, and that
> it would be included by plaintiff in his bid.  It was
> to its own interest that the contractor be awarded the
> general contract; the lower the subcontract bid, the
> lower the general contractor's bid was likely to be and
> the greater its chance of acceptance and hence the
> greater defendant's chance of getting the paving
> subcontract.  Defendant had reason not only to expect
> plaintiff to rely on its bid but to want him to.
> Clearly defendant had a stake in plaintiff's reliance
> on its bid.  Given this interest and the fact that
> plaintiff is bound by his own bid, it is only fair that
> plaintiff should have at least an opportunity to accept
> defendant's bid after the general contract has been
> awarded to him.

386 F. Supp. at 694.  *See also* <u>Montgomery Industries Intern.,</u>

<u>Inc. v. Thomas Const. Co., Inc.</u>, 620 F.2d 91 (5th Cir. 1980) (A

subcontractor who submits a bid to a general contractor, knowing

the general contractor is going to rely on its bid in submitting

the general bid, is bound unless it is clearly shown that the

subcontractor's bid offer was not final.); <u>Air Conditioning Co.</u>

<u>of Hawaii v. Richards Const. Co.-Kaneohe Bay Project</u>, 200 F.

Supp. 167 (D.C. Hawaii 1961), <u>aff'd</u>, 318 F.2d 410 (9th Cir. 1963)

(When bid was intended to induce action of a definite and

substantial character on the part of the promisee, the court held

the promisor to the promise.).

## EQUITABLE ESTOPPEL UNDER ERISA

The following discussion of ERISA liability theories is relevant if this court is reversed for holding defendant is liable to plaintiffs for breach of contract, or as supplemental theories of liability. A supplemental holding of ERISA liability affects plaintiffs' right to recover attorney's fees (available under ERISA, but not for breach of contract). The theories of the following ERISA holdings are therefore both alternative and supplemental, and the discussion assumes that, for some reason, ERISA applies to this dispute, even though Mr. McWilliams was never covered by any ERISA plan while he was employed and did not retire under any ERISA plan. The defendant did execute, or attempt to execute, its part of the bargain with Mr. McWilliams and his wife by covering them, after his retirement, into a self-funded plan which had been created to cover ERISA-eligible and ERISA-covered employees. It is the opinion of the court that the best way to conceive of the case at bar and holding rendered herein is that there was a contract liability which the defendant executed by awarding vested ERISA rights. Therefore, liability exists for both breach of contract and failure to fulfill the vested ERISA rights.

Having discussed equitable estoppel as a recognized contract doctrine in Alabama, the court moves its discussion to the use of equitable estoppel as an alternative ground for relief

41

under ERISA.  Since the case at bar was tried as an ERISA case as
well as a state law contract case, it is necessary to turn to the
manner in which the Eleventh Circuit has dealt with equitable
estoppel in an ERISA context.  At issue in <u>National Companies
Health Benefit Plan</u> v. <u>St. Joseph's Hospital of Atlanta</u>, 929 F.2d
1558 (11th Cir. 1991), was the ERISA provision allowing an
employer to terminate continuation coverage due to "[g]roup
health plan coverage."  The court stated the following:

> [S]ince continuation coverage is, by operation of law,
> part of every ERISA plan, an ERISA-plan sponsor's
> representations to its employees as to the meaning of
> COBRA's and the Tax Reform Act's amendments to ERISA is
> an interpretation of a provision of the plan itself.
> Thus, if the ERISA provider misinforms its employee
> about his rights to continuation coverage, and the
> employee relies on that misinformation to his
> detriment, the provider will be held liable under the
> equitable doctrine of estoppel.

929 F.2d at 1566.

The same opinion at 929 F.2d 1571, 1572, reiterated the
principle that ERISA preempts all state common law claims
relating to employee benefit plans, including equitable estoppel
claims, but went further to hold the following:

> "Federal courts possess the authority, however, to
> develop a body of federal common law to govern issues
> in ERISA actions not covered by the act itself."  <u>Kane</u>,
> 893 F.2d at 1285.[36]  In <u>Nachwalter</u> v. <u>Christie</u>, 805

---

[36]  <u>Kane</u> v. <u>Aetna Life Insurance</u>, 893 F.2d 1283 (11th Cir.
1990), <u>cert. denied</u>, 498 U.S. 890, 111 S. Ct. 232, 12 L. Ed. 2d
192 (1990).  The court held that ERISA did not preempt employee's
equitable estoppel claims, to the extent of holding the insurer
to its agent's interpretation of ambiguous terms in the plan.
"Federal courts possess the authority, however, to develop a body
of federal common law to govern issues in ERISA actions not

42

F.2d 956, 960 (11th Cir. 1986), this court held that
the federal common-law claim of equitable estoppel is
not available to plaintiffs in cases involving oral
amendments to or modifications of clear terms of
employee benefit plans governed by ERISA.

. . .

The court (in <u>Kane</u>) held that the federal common-law
claim of equitable estoppel may be applied when an
employee relies, to his detriment, on an interpretation
of an ambiguous provision in a plan by a representa-
tive[37] of that plan.[38]  <u>Kane</u>, 893 F.2d at 1286.  An
ambiguous provision is one about which "reasonable
persons could disagree as to [its] meaning and effect."

---

covered by the act itself."  893 F.2d at 1285.  The court agreed
with the appellant that the federal common law of equitable
estoppel applied because the representations made by Aetna to
Mrs. Kane and the hospital were interpretations of an ambiguous
provision of the plan, not modifications.  893 F.2d at 1285.  The
court held Aetna was acting by and through its duly authorized
representative.

[37]  The ambiguous terms in the 1980 AMI plan document are
susceptible to differing interpretations.  The plan, which had no
SPD's and no modification right, provided medical plan coverage
(as provided by the Diener letter) until the potential retiree
and his covered dependents were covered by Medicare.

[38]  After assurances by Aetna that the Southern Bell Em-
ployee Medical Benefit Plan which covered Mr. Kane would cover an
infant born prematurely with severe medical complications, the
Kanes adopted the child.  The Kanes did not have a copy of the
plan.  When Mrs. Kane called the Macon, Georgia, office of Aetna,
which administered the plan for Southern Bell, the Aetna agent
informed her the child would be covered from the date of the
commencement of formal adoption proceedings.  An Aetna agent also
told the hospital the medical expenses of the child would be
covered under the plan beginning June 1, 1984.  The child re-
mained in the hospital until July 5, 1984.  Aetna denied the
claims when filed, claiming that formal adoption proceedings did
not begin until after the child was hospitalized and it was not
obligated to pay the claims where hospitalization began prior to
coverage.  The Kanes sued claiming equitable estoppel and wrong-
ful denial of a claim.

National Companies Health Benefit Plan v. St. Joseph's
Hospital,[39] 929 F.2d 1558 (11th Cir. 1991), dealt with the issue
of whether Robert Hersh and his dependents covered by an ERISA
group health plan had coverage after his resignation from
National Distributing Company.  Several months following his
resignation Mrs. Hersh gave birth to premature twins who required
extensive medical care.  The district court's holding in favor of
the Hershes and St. Joseph's was affirmed by the circuit which
held: (1) an ERISA provider is not required to offer continuation
coverage to an employee or his dependents who are covered under a
preexisting group health plan at the time of the employee's
termination; and (2) if ERISA provider *misinforms* the employee
about his right to continuation coverage and the *employee relies*
on that information, the provider will be held liable under the
doctrine of estoppel.  Mr. Hersh had not only relied on the
representations made to him in the continuation coverage
agreement he signed, but on a memorandum describing the
continuation coverage.  As in the Diener letter to Mr. McWilliams
which instructed: "Please contact your local benefits
representative for information about the cost of this benefit,"[40]
the memorandum to Hersh directed additional inquiries to be made
to the manager.  929 F.2d at 1574.  The St. Joseph's court

---

[39]  The holding in St. Joseph's was limited to interpreta-
tions of ambiguous provisions.

[40]  Plaintiff's Exhibit No. 1, at 2.

awarded damages, attorneys' fees,[41] and prejudgment interest and awarded injunctive relief. The carrier was required to assume its role as primary insurer for Mr. Hersh and his children. It was required to assume all unpaid medical expenses, and to reimburse all medical expenditures Mr. Hersh had had to pay. National was estopped from disclaiming its obligation of providing the Hershes continuing coverage for thirty-six months.

The St. Joseph's court set forth the elements of equitable estoppel as defined by "federal common law" to be as follows:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

929 F.2d at 1572.

In awarding attorneys' fees and costs the St. Joseph's court opined the court should consider the following:

> "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a

---

[41] ERISA provides that "[i]n any action under this sub-chapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

significant legal question regarding ERISA itself; and
(5) the relative merits of the parties' positions."[42]

929 F.2d at 1575 (quoting Iron Workers Local No. 272 v. Bowen,

624 F.2d 1255, 1266 n.18 (5th Cir. 1980).[43]  Ironically, in the

pending case upon looking at its relative merits ((5) above), the

defendant admits there is liability when there is a contract, but

is blind to the easily visible contract AMI had with Mr.

McWilliams.

The St. Joseph's court reasoned that if National did

not have to pay attorneys' fees, it would only be liable for what

it should have paid before the litigation began.  In a strongly

worded opinion the court stated:

> With nothing to lose but their own litigation costs,
> other ERISA-plan sponsors might find it worthwhile to
> force underfinanced beneficiaries to sue them to gain
> their benefits or accept undervalued settlements.
> Assessing attorneys' fees against National will make
> it, and other ERISA-plan sponsors, less likely to make
> representations to beneficiaries concerning their group
> health coverage and then to attempt to renege on their
> obligations; furthermore, ERISA-plan sponsors will be
> motivated to inform beneficiaries quickly of their
> rights when Congress amends ERISA.

929 F.2d at 1575-76.

---

[42]  In material following the quoted material the court
stated that no one of the factors is necessarily decisive, and
some might not apply in a given case.  929 F.2d at 1575.

[43]  The Eleventh Circuit adopted as binding precedent all
decisions of the former Fifth Circuit handed down prior to
October 1, 1981, in Bonner v. City of Prichard, 661 F.2d 1206,
1209 (11th Cir. 1981) (en banc).

Although Alabama does not recognize the tort of negligent misrepresentation recognized in <u>Lordmann Enterprises, Inc. v. Equicor, Inc.</u>, 32 F.3d 1529 (11th Cir. 1994), <u>cert. denied</u>, 116 S. Ct. 335, 133 L. Ed. 2d 234 (1995), <u>Lordmann</u> is important to the pending case for its discussion of equitable estoppel. The <u>Lordmann</u> court notes the Eleventh Circuit has recognized a federal ERISA claim for equitable estoppel **when a plan administrator makes a representation that interprets,** rather than modifies, an ambiguous term of the plan. 32 F.3d at 1534 (referring to <u>Alday v. Container Corp. of America</u>, 906 F.2d 660, 666 (11th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1026, 111 S. Ct. 675, 112 L. Ed. 2d 668 (1991)); <u>Kane v. Aetna Life Ins.</u>, 893 F.2d 1283, 1285 (11th Cir), <u>cert. denied</u>, 498 U.S. 890, 111 S. Ct. 232, 112 L. Ed. 2d 192 (1990). Prior to his retirement, Mr. McWilliams' AMI health care coverage to age 65 was set forth in the Diener letter, a representation which was confirmed by Dr. Moxley, AMI senior vice president (restating Diener's letter). The Hwee memo, prepared by the AMI health claims manager, made a representation that interpreted the McWilliams' coverage as life coverage. It further represented acknowledgment of the Diener/McWilliams contract. Additionally, the Diener letter, is not only an interpretation of an ambiguous term (eligible employees) within the 1980 plan by AMI's president and CEO, but an offer which led to an acceptance and creation of a common law

47

contract for continued health care coverage for the plaintiffs to age 65.

In <u>Novak v. Irwin Yacht and Marine Corp.</u>, 986 F.2d 468 (11th Cir. 1993),[44] the court held that equitable estoppel did not apply because ERISA's exclusion of oral modifications of employee benefit plans allows estoppel to apply only to ambiguous provisions of the plan, but stated:

> [W]e may apply equitable estoppel when the representa-
> tions made were interpretations, not modifications, of
> the plan. ... For a representation to be an inter-
> pretation of a plan, the relevant provisions of the
> plan must be ambiguous, that is to say, "reasonable
> persons could disagree as to [the provisions'] meaning
> and effect." <u>Id.</u> (Citing <u>Kane</u>, 893 F.2d at 1285.)

986 F.2d at 472. The <u>Novak</u> court ruled that the provisions of the plan at issue there were not ambiguous.

In <u>Hudson v. Delta Air Lines, Inc.</u>, 90 F.3d 451 (11th Cir. (Ga.) 1996), <u>cert. denied</u>, ___ S. Ct. ___, 65 U.S.L.W. 3584 (1997), retirees brought suit against the airline for breach of ERISA and a state law contract claim pursuant to 28 U.S.C. § 1367[45] which empowers the federal court to hear supplemental claims. <u>Hudson</u> was before the court as an ERISA case. The

---

[44] Novak was a participant in a group health plan adminis-
tered by his former employer. He filed suit alleging violations
of ERISA, seeking recovery for unpaid medical expenses.

[45] "[I]n any civil action of which the district courts have
original jurisdiction, the district courts shall have supplemen-
tal jurisdiction over all other claims that are so related to
claims in the action within such original jurisdiction that they
form part of the same case or controversy under Article III of
the United States Constitution. ..." 28 U.S.C. § 1367(a).

question was whether the court was empowered to adjudicate the
state law contract claim.   In discussing its supplemental
jurisdiction the court said: "The court's power to adjudicate
Count V[46] therefore turns on whether the state law cause of
action alleged therein is so related to an ERISA ground that they
form part of the same case or *controversy*."   Id. at 455.   The
circuit agreed with the district court that Count V did not arise
from the same controversy as the ERISA claims because flight
privileges were not part of the ERISA benefits package.   The
court affirmed the dismissal of Count V because there was not
sufficient nexus between the state and federal claims.   In the
case at bar, however, AMI's conflicting interpretation of Mr.
McWilliams' health care coverage as originally being a simple
insurance contract and later being an ERISA plan, and its
insistence that it honored contracts outside of ERISA it had with
other retirees, plus its admission that such extra-ERISA
contracts did create liability, bring the state law breach of
contract claim within the parameters of this court's
jurisdiction.[47]   AMI's confused positions entwine potential

---

[46]   Count V of the complaint alleged a suit for breach of
contract under Georgia law.   The claim was predicated upon
allegations that Delta made repeated promises to the plaintiffs
during their employment that retirees who were at least 52 years
old and had worked for Delta for at least ten years would be
entitled to certain flying privileges throughout their retire-
ment.

[47]   This court has jurisdiction for two reasons: 1) after
retirement Mr. McWilliams became part of an ERISA plan; and 2)
diversity of citizenship exists between plaintiffs and defendant.

contract liability and potential ERISA liability so that neither
position can even be discussed without reference to the other.
Both positions arise from precisely the same set of facts.  The
plaintiffs, of course, claim liability in contract and under
ERISA from precisely the same facts.

Under the Hudson ERISA contract claim, the court held
that the merits of the claim depended on evidence of the
bilateral contract.  "This will require proof of *written* plan
documents which notified the putative class that the terms of
their medical benefits plan would remain constant throughout
their retirement if they retired on or before January 1, 1993."
90 F.3d at 457.  The court referred to dicta in Alday, 906 F.2d
at 666 n.15, in which it said:

> ERISA fiduciaries might not be insulated from liability
> on the basis of the formal written plan documents where
> contradictory and fraudulent promises are made in
> informal communications for the purpose of deceiving
> employees with respect to their benefits.

90 F.3d at 458.


**VESTED INTEREST UNDER ERISA**

Both parties have referred the court to Wise v. El Paso
Natural Gas Co., 986 F.2d 929 (5th Cir. 1993), in which the Fifth
Circuit affirmed the lower court's ruling that El Paso had no
statutory or contractual obligation to continue post-retirement
benefits and was free to eliminate coverage.  When El Paso was

purchased by Burlington Northern, Inc., in December 1983,
Burlington paid the full cost of its retirees' insurance.  When
FAS 106 went into effect Burlington modified the plan by
extending coverage to only those who retired on or before
March 1, 1986.  El Paso is important to the case at bar because
of the Fifth Circuit's discussion of "**vesting**."  "An employer's
welfare plan may designate a vested benefit."  986 F.2d at 937.
See Vasseur v. Halliburton Co., 950 F.2d 1002, 1006 (5th Cir.
1992) ("An employer can obligate itself contractually to maintain
benefits at a certain level in ways that are not mandated by
ERISA.").  See also, e.g., In re White Farm Equipment Co., 788
F.2d 1186, 1193 (6th Cir. 1986) (Looking to basic contract law
the court concluded parties may themselves set out by agreement
or by private design whether retiree welfare benefits vest, or
whether they may be terminated.).

        Although there is no mandatory vesting of retiree
welfare benefits, the parties in the instant case contracted
vesting of health care coverage.  The 1980 plan document,[48] at 3,
specifically states in positive, granting language:  "The
coverage of an employee and his dependents will terminate if the
individual ceases to be an eligible employee[49] or if the Plan

---

[48]   Defendant's Exhibit No. 8.

[49]   Previously discussed under ambiguities on pages 14-15 of
this memorandum opinion.

should be discontinued." There was no other reservation of rights or a conflict between the plan and SPD's. There were, in fact, no SPD's until after McWilliams' retirement. Unlike El Paso, which dealt with ambiguities created by conflicts between the plan document and SPD's, **there were no SPD's for the 1980 plan**, nor was there provision for amending the 1980 plan. Had the possibility existed for amendment by SPD's[50] as allowed by the Fifth Circuit El Paso court, no such amendment was effected. The 1980 plan which covered Mr. McWilliams was not terminated until 1995, long after his rights vested. Termination of the plan after suit was filed fulfilled a self-serving reason. Mr. McWilliams' legal rights were fixed at the time suit was filed, if not before. His rights actually vested upon retirement in 1987 by reason of his contract with defendant. Unilateral actions taken thereafter by defendant have no effect.

In Ferninand S. Tinio's annotation *Private Pension Plan: Construction of Provision Authorizing Employer To Terminate or Modify Plan*, the author discusses the effect modification or termination of pension plans has on employees' vested rights. Pertinent language follows:

---

[50] Defendant's counsel Frank James has admitted SPD's do not control plan documents when he stated: "If there is any conflict between the plan documents and the summary plan descriptions, then the plan documents control. That is the law. It is clearly the law. It has always been the law under E.R.I.S.A." *Transcript at 50.*

It has been held that once an employee has complied with all the conditions for entitlement to a pension from a non-contributory plan, his rights thereto become vested, and his employer cannot deprive the employee of his benefits under a provision in the plan authorizing the employer to terminate or modify it for any reason.

. . .

[T]he court (Cantor v. Berkshire Life Ins. Co., 171 Ohio St. 405, 14 Ohio Ops 2d 157, 171 N.E.2d 518 (1960)), concluded that whether a retirement plan is contributory or noncontributory, once an employee who has accepted employment under such plan has complied with all the conditions entitling him to participate in the plan, his rights become vested and the employer cannot divest him of his rights thereunder, even though the employer, as in this case, had reserved the right to amend or terminate the plan.

Ferninand S. Tinio, Annotation, *Private Pension Plan: Construction of Provision Authorizing Employer To Terminate or Modify Plan*, 46 ALR 3d 464, 468-470 (1972).

There is an analogy between Williston's[51] finding of consideration for continued service based on an offer of a pension or other reward or benefit and AMI's offer of early retirement benefits to those who accepted them. Williston says the following:

The weight of authority enforces such promises ... on the view that where the promise of the pension or death benefit is made in advance of work to encourage faithful service, a contract is formed upon the completion by the employee of his employment.

---

[51]  3 Samuel Williston, A Treatise on the Law of Contracts § 7:38 (4th ed. 1992).

3 Samuel Williston, A Treatise on the Law of Contracts § 7:38, at 629 (4th ed. 1992).  Mr. McWilliams continued his employment with AMI for four years after receipt of Diener's letter in reliance on the promises therein.  His contract with AMI was thus completed upon his retirement and his interests vested.


## ERISA UNDER CURTIS-WRIGHT CORP. V. SCHOONEJONGEN

The defendant has referred the court to Curtis-Wright Corp. v. Schoonejongen, 514 U.S. 73, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995), on remand to, Schoonejongen v. Curtiss-Wright Corp., 66 F.3d 312 (3rd Cir. 1995), arguing that it precludes plaintiffs from successful suit.  This 1995 holding, though retroactive, is not applicable to McWilliams' vested rights.  The issue in Curtiss-Wright concerned the interpretation of 29 U.S.C. § 1102(b)(3), which requires an ERISA plan to have a procedure for amending a plan and requires it to identify those who have the authority to do so.  Although the 1980 plan document before the court had no amendment procedure per se, AMI nevertheless had the inherent ability pursuant to statute (as interpreted by the Curtis-Wright holding) to amend the plan had the McWilliams' rights not been vested.  Even had the McWilliams' rights not vested, it is important to note that the case at bar is distinguishable from Curtis-Wright because it does not deal with

an attempted amendment.  In <u>Curtis-Wright</u> the court granted

certiorari "on the questions whether a plan provision stating

that '[t]he Company' reserves the right to amend the plan states

a valid amendment procedure under § 402(b)(3) and, if not,

whether the proper remedy is to declare this or any other

amendment void *ab initio*."  115 S. Ct. at 1228, 131 L. Ed. 2d at

100.

The Curtis-Wright amendment procedure ruled upon by the

court was stated accordingly:

> "The Company reserves the right at any time and from
> time to time to modify or amend, in whole or in part,
> any or all of the provisions of the Plan."

115 S. Ct. at 1223, 131 L. Ed. 2d at 99.  This language

significantly differs from that in the case at bar:  There is no

reservation clause in the 1980 McWilliams **plan** document as in

<u>Curtiss-Wright</u>, nor are there any SPD's for the AMI 1980

document.  While holding that the Curtis-Wright reservation

clause satisfied the plain text of both § 402(b)(3) requirements,

the holding was not a *carte blanche* ruling upholding the validity

of all amendments to ERISA plans.  The court left the door open

by stating:

> [We do not mean to imply that there is anything wrong
> with plan beneficiaries trying to prove that
> unfavorable plan amendments were not properly adopted
> and are thus invalid.  This is exactly what respondents
> are trying to do here, and nothing in ERISA is designed
> to obstruct such efforts.  But nothing in ERISA is
> designed to facilitate such efforts either.  ...
> ERISA, rather, follows standard trust law principles in

dictating only that **whatever level of specificity a company ultimately chooses, in an amendment procedure[52] or elsewhere, it is bound to that level** (emphasis added).

115 S. Ct. at 1231, 131 L. Ed. 2d at 104.   The Supreme Court remanded the case to the circuit to decide whether the Curtis-Wright valid amendment procedure was followed stating:   "The answer will depend on a *fact-intensive inquiry*."   115 S. Ct. at 1231, 131 L. Ed. 2d at 104 (emphasis added).

## HOLDING I.

### SIMPLE CONTRACT

I.   In keeping with Curtiss-Wright, based on the "fact-intensive inquiry," the court holds the Diener letter (**offer**) and subsequent **acceptance** coupled with McWilliams' taking early retirement at a reduced income and twice declining other employment opportunities having health care benefits (**consideration**) formed a simple contract between Mr. Williams and AMI, with Mrs. McWilliams being a third party beneficiary.   The contract was confirmed during McWilliams' discussion of retirement with Dr. Moxley, vice president of the company.   The offer of health insurance for the McWilliams made in the Diener letter plus later proof of the contract formed, as evidenced by

---

[52]   There was no amendment procedure in the 1980 plan nor any SPD's for the plan.

the Moxley reaffirmance of the offer contained in the letter, and further evidenced by the Hwee memo, belie the assertion that this is not a contract case. As acknowledged and conceded by AMI officials, Mr. McWilliams' coverage in the **non-ERISA** Executive Health Plan was simply an insurance contract that contained no provision granting termination rights to the employer. There was no plan document other than the insurance contract.[53] Mr. McWilliams was free to accept Mr. Diener's offer until such time as the offer was withdrawn. The terms of the Diener letter were never revoked or withdrawn. When Mr. McWilliams accepted the offer a binding contract between him and AMI was formed. Acceptance of AMI's offer plus consideration completed the contract. McWilliams not only retired from employment with AMI at a reduced income in consideration of the offer, he forwent other offered employment with accompanying health care benefits.

Furthermore, following Corbin, a binding contract was formed with Mrs. McWilliams as beneficiary of that contract. She had every right to believe she had coverage.

In using the language of defendant, AMI was "honor bound" (as well as legally bound) to honor the Diener/McWilliams

---

[53] Original testimony. *Transcript at 188-189. Transcript at 149, 156, 158.* Mr. McWilliams was covered by AMI's Executive Medical Policy # GH 20328-9 with Northwestern National Life Insurance Company, a policy which was not canceled until January 1, 1989.

contract.  Both French and Martindale[54] testified that if
retirees had written documents AMI was bound to honor them.  They
did, in fact, honor contracts made with other retirees, several
of which were contracts between retirees and a hospital
administrator.  It is inconceivable to the court that AMI would
honor a contract made by a hospital administrator with managers
and not one made by the CEO and president of the company with an
officer of the company.

     By complying with the conditions of the Diener offer
Mr. McWilliams' rights became vested in 1987.  From the time of
the 1983 Diener letter until his retirement in 1987, Mr.
McWilliams worked under the offered contract terms rendering
faithful service for delayed compensation in the form of health
care benefits upon his retirement.  The AMI/Diener contract was
executed upon the completion of McWilliams' employment in 1987,
and McWilliams' rights vested at that time.  His employer AMI
cannot thereafter deprive him of vested health care benefits.

     The court holds the Diener/McWilliams contract was a
simple insurance contract outside the parameters of ERISA.  AMI
offered McWilliams medical benefits in exchange for his early
retirement.  Those benefits vested when McWilliams retired.  AMI
breached the contract and is thus liable for damages the
McWilliams have suffered in the amount of $2,115.15.  AMI is to

---

     [54]  Martindale is an attorney.

pay interest[55] on the amount expended by the McWilliams for their
medical care ($2,115.16 as of the time of suit).  AMI is to
assume all unpaid medical expenses incurred since the time of
trial not itemized in document 25 of the court file.  AMI is to
reinstate the contract retroactively and provide health coverage
for the McWilliams to age 65.

Furthermore, AMI is to pay Mr. and Mrs. McWilliams
$250,000.00 each for the mental anguish they sustained as a
result of AMI's breach. The defendant knew breaching the contract
would probably subject plaintiffs to distress.  French in essence
so testified.  AMI knew the McWilliams were uninsurable.  AMI
knew from communications with the McWilliams and their attorney
that breaching the contract would and did subject the plaintiffs
to mental distress.  Accordingly, under Alabama law which has
long recognized exceptions to the general rule denying recovery
for mental anguish in breach of contract cases, AMI is liable to

---

[55] "All contracts, express or implied, for the payment of
money, or other thing, or for the performance of any act or duty
bear interest from the day such money, or thing, estimating it at
its money value, should have been paid, or such act, estimating
the compensation therefor in money, performed." Ala. Code
§ 8-8-8 (1975). Thomas v. Liberty National Life Insurance
Company, 368 So. 2d 254 (Ala. 1979), provides that the statute is
automatically a part of the insurance contract, and therefore
became a contractual right. Nelson v. AmSouth Bank, N.A., 622
So. 2d 894 (Ala. 1993), states that § 8-8-8 allows prejudgment
interest on damages for breach of contract.  This principle as
stated in Alabama Pattern Jury Instruction 10.18 allows interest
on damages for breach of contract from the date the plaintiff was
entitled to the damages at the rate of 6 percent per annum from
that date.

the McWilliams for the mental distress they suffered.   In F.
Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So.
630, 631 (1932)), the court stated:

> "Yet where the contractual duty or obligation is so
> coupled with matters of mental concern or solicitude,
> or with the feelings of the party to whom the duty is
> owed, that a breach of that duty will necessarily or
> reasonably result in mental anguish or suffering, it is
> just that damages therefor be taken into consideration
> and awarded."  8 R.C.L. p. 529 § 83 (passage quoted
> again in Sanford v. Western Life Ins. Co., 368 So. 2d
> 260 (1979).

Becker is referenced following Alabama Pattern Jury Instruction
10.28, the charge for "Damages--Mental Anguish and Physical
Suffering."


## HOLDING II.

### CONTRACT BY PROMISSORY ESTOPPEL

        The court also holds alternatively that AMI is liable
to the McWilliams for breach of a contract created through the
principles of promissory estoppel.  This ruling, too, is outside
ERISA and is based on Alabama contract law principles.  To allow
AMI to escape liability by asserting a technical rule of law
under ERISA when it has admitted Mr. McWilliams was not covered
by an ERISA health plan is "contrary to equity and good
conscience."  Mazer.  Mr. Diener made a definite promise which
could reasonably be expected to induce action on the part of Mr.
McWilliams.  It was foreseeable that he and his wife would (and

did) rely on the Diener offer, the Moxley reaffirmance of that
offer, and the Hwee statement of coverage.  The McWilliams had
every right to believe that the CEO and president of AMI was in a
position to make a binding offer.  Diener was AMI's alter ego.
He not only had the apparent authority to make a contract, he had
the **actual** authority to contract (in the form of implied
authority, if not express authority).  Too, the McWilliams had
every right to believe that the AMI health claims manager was
knowledgeable about the status of their health coverage.  The
Diener promise did, in fact, induce Mr. McWilliams to take early
retirement.  The promise did, in fact, prevent Mr. McWilliams
from accepting other employment by which he and his wife would
have had health coverage.  The promise did, in fact, cause Mr.
and Mrs. McWilliams harm.  They relied upon the promise to their
detriment.  The four elements of promissory estoppel are present:
1) the express promise by Diener for AMI to provide health care
coverage (for both McWilliams) for Mr. McWilliams' early
retirement; 2) reasonable foreseeability that Mr. McWilliams
would rely on the promise; 3) justifiable and material reliance
by Mr. McWilliams on the promise; and 4) the inevitable injustice
that resulted from the breach of the promise by AMI.

In section 5 of Annotation. *Pension Plan--Rights of
Employee,* 42 A.L.R. 470 (1955), the annotation discusses
promissory estoppel as an alternate additional remedy beyond a

contract established by the pension plan "for giving an enforceable right to an employee who has relied upon representations that he would be entitled to a pension upon completion of a certain period of service." On point is the case of <u>Hunter v. Sparling</u>, 87 Cal. App. 2d 711, 197 P.2d 807 (1948), cited in the annotation, which not only found an enforceable contract to pay the pension to the employee, but found additionally that "the pension was collectible under the theory of promissory estoppel, since it was in evidence that after the plaintiff knew of the promise he received several offers of employment by other firms and turned them down."

Mr. McWilliams materially changed his position in reliance on the induced promise, going from active to inactive employment, and forgoing other opportunities for health care coverage. The Diener promise was an unsolicited one. The McWilliams have suffered unjustifiably, and will continue to suffer, because of the actions of defendant.

The court holds that AMI is liable for the full money damages the McWilliams have suffered itemized at time of trial at $2,115.16; full money damages for medical expenses incurred since the time of trial; reinstatement of their health care coverage; and damages for mental anguish and suffering.

## HOLDING III.

### CONTRACT BY RESTATEMENT (SECOND) OF CONTRACTS § 90

The court alternatively holds that AMI is liable to the McWilliams for breach of contract based on section 90 of the Restatement (Second) of Contracts, a remedy which goes beyond the language of promissory estoppel to reach an equitable result and avoid injustice. This ruling, too, is outside of ERISA, and based on Alabama contract law principles. Alabama has adopted the language of section 90. <u>Mazer</u>, 340 So. 2d at 773. At the time AMI mailed the Diener letter it knew or should have known that its recipients would rely on the letter. Reliance on a letter from the CEO of the company was reasonable. Mr. McWilliams detrimentally relied on the promise of health care benefits until he reached age 65 by taking early retirement from AMI and by turning down proffered employment elsewhere. Mrs. McWilliams--a third party beneficiary--relied on the promise that she, too, would have health care benefits until age 65. Their reliance on AMI's promise has caused them harm.

The court has found two Restatement illustrations directly on point. <u>Sparling</u>, supra, refers to Restatement of Contracts § 90 illus. 2 (1932), set forth below:

> A promises B to pay him an annuity during B's life. B thereupon resigns a profitable employment, as A expected that he might. B receives the annuity for some years, in the meantime becoming disqualified from

again obtaining good employment.  A's promise is
binding.

87 Cal. App. 2d at 726, 197 P.2d at 816.

Restatement (Second) of Contracts § 90 cmt. b., illus.
4 (1981), which follows, uses another example equally applicable
to Mr. McWilliams:

A has been employed by B for 40 years.  B promises
to pay A a pension of $200 per month when A retires.  A
retires and forbears to work elsewhere for several
years while B pays the pension.  B's promise is
binding.

Following these Restatement illustrations AMI's promise to
McWilliams to provide health care benefits to age 65 is binding.

The evidence shows AMI's testimony is contradictory.
At one point corporate representative Martindale testified there
was no plan document:  McWilliams was covered by an insurance
contract.  At another she testified he was covered by the
"recently found" 1980 plan document.  Even so, Mr. McWilliams
never saw a copy of the plan document nor had any knowledge of
its existence prior to suit.  Had Mr. McWilliams been part of an
ERISA plan, he would have been covered by that 1980 document[56]
which contained no reservation of the right to amend--a plan not
terminated until December 1995, almost a full year after this
suit was filed.  By that time AMI had formed a binding contract
with McWilliams.

---

[56]   No amendment was effected by the issuance of any SPD's
to the 1980 plan.

The Diener letter plus Mr. McWilliams's acceptance and
reliance formed a binding contract for health coverage for the
McWilliams until age 65--a contract further evidenced by the Hwee
memo listing life health coverage for the McWilliams (showing a
meeting of the minds at least to age 65).[57]  The McWilliams had
the right to rely on the material furnished by the health care
manager of AMI.  If the memo was in error, Ms. Martindale, as
director of benefits, and AMI had the obligation to correct the
error.  The error was not rectified and Ms. Martindale knew that
the error had not been corrected at the time she used her
discretionary power to decide to terminate the McWilliams'
coverage.  Conversely, the McWilliams had no way of knowing the
memo did not correctly reflect their status.


## ALTERNATIVE AND SUPPLEMENTAL HOLDINGS UNDER ERISA

The court has issued the alternative rulings under
ERISA in the event it is reversed on its three contract holdings:
1) simple contract, 2) contract by promissory estoppel, and 3)
section 90 contract.  These ERISA holdings are also supplementary
holdings to the contract ones.  The defendant is liable both for
breach of contract and for violation of its ERISA obligations.

---

[57]   The McWilliams never relied on any "lifetime" coverage
representation.

It executed its contract obligations by adding the McWilliams (after his retirement) to its ERISA-covered group of employees and retirees with plaintiffs' rights having vested.  It then violated its ERISA obligations to plaintiffs--obligations which it assumed in order to execute its contract obligations and which were relied upon by plaintiffs as vested rights.

## ERISA & SUPPLEMENTAL ALTERNATIVE HOLDING I.

### EQUITABLE/PROMISSORY ESTOPPEL

Even were the McWilliams' claims not vested,[58] AMI would be liable alternatively and supplementarily under ERISA under the doctrine of equitable/promissory estoppel, set forth previously, in order to insure equity and justice for Mr. and Mrs. McWilliams.  By misinforming Mr. McWilliams of his right to continuation coverage, AMI is liable under ERISA under the equitable doctrine of estoppel.  McWilliams relied on that misinformation to his detriment.  "[I]f the ERISA provider *misinforms* its employees about his rights to continuation coverage, and the *employee relies* on that misinformation to his detriment, the provider will be held liable under the equitable doctrine of estoppel (emphasis added)."  St. Joseph's, 929 F.2d at 1566.

---

[58]  See discussion below.

66

Additionally, if ERISA controls, AMI is bound by the provisions of the 1980 plan document in effect at the time of McWilliams retirement--a plan which was not amended or terminated until 1995.  The court holds that the Diener letter written by the president and CEO was an interpretation of that plan. Diener's letter clearly interpreted the ambiguous language "*eligible employee*" in the 1980 plan to include retirees and to provide them health care coverage until age 65.  According to El Paso, the ambiguous term "*eligible employee*" found in the plan document is construed in favor of the employees who are powerless to affect the drafting of the policy.  El Paso 986 F.2d at 981-82.  The court agrees with the El Paso assessment that "[a]ccuracy is not a lot to ask."  Id.  See also, Kane, 893 F.2d 1283 (11th Cir. 1990) (The federal common law ERISA doctrine of equitable estoppel may be applied where the provisions of the plan at issue are ambiguous such that reasonable persons could disagree as to their meaning or effect.).

Mr. McWilliams has entered into evidence written documents he had with AMI:  1) the Diener letter; and 2) the Hwee memo.  These documents contained no reservation or termination rights.  They establish that the McWilliams' "medical benefits plan would remain constant."  Hudson, 90 F.3d at 457.  Corporate representative Martindale has testified the 1980 plan document had no reservation of rights to amend.  As an ERISA fiduciary AMI

is not insulated from its representations which deceive employees with respect to their benefits. <u>Alday</u>, 906 F.2d at 666 n.15.

Mr. McWilliams has presented evidence he relied to his detriment on the Diener letter/Hwee memo that he had health care coverage to age 65. He took early retirement. He turned down other employment opportunities with Parkside and the National Council of Alcoholism--both of which had accompanying health benefits. Because of reliance on his AMI insurance contract Mr. McWilliams has been faced with a situation in which neither he nor his wife have had health insurance coverage during times of great medical need. It was AMI's repudiation of their health care coverage which caused them harm. 33 F.3d at 1346-47.[59]

---

[59] N.B. The foregoing discussed Eleventh Circuit cases holding equitable estoppel applicable under ERISA are: <u>Novak</u>, 986 F.2d 468 (11th Cir. 1993) (can apply equitable estoppel when the representations made were interpretations, as in the instant case, not modifications of the plan); <u>St. Joseph's</u>, 929 F.2d 1558 (11th Cir. 1991) (If ERISA provider misinforms its employee about his rights to continuation coverage, and the employee relies on that information to his detriment, the provider will be held liable under the equitable doctrine of estoppel); <u>Kane</u>, 893 F.2d 1283 (11th Cir. 1990) (ERISA did not preempt employee's equitable estoppel claims, to extent of holding the insurer to its agent's interpretation of ambiguous terms in the plan; <u>Alday</u>, 906 F.2d 660, (11th Cir. 1990)(recognizes a federal ERISA claim for equitable estoppel when a plan administrator makes a representation that interprets, rather than modifies, an ambiguous term of the plan).

**ERISA & SUPPLEMENTAL ALTERNATIVE HOLDING II.**

**MCWILLIAMS' VESTED INTEREST UNDER ERISA**

The court further holds as a supplemental holding and alternatively that the McWilliams' ERISA rights have **vested.** AMI obligated itself contractually to maintain insurance coverage to age 65 for the McWilliams—a contractual obligation not mandated by ERISA nor changed by amendment or termination. This is nothing more nor less than a vesting by mutual agreement. As stated in Vasseur 950 F.2d at 1006, "An employer can obligate itself contractually to maintain benefits at a certain level in ways that are not mandated by ERISA." *See also* El Paso, 986 F.2d at 937; In re White, 788 F.2d at 1193. Holding that the McWilliams' ERISA rights have vested is consistent with the central purpose of Congress in enacting ERISA legislation: "to prevent the 'great personal tragedy'[60] suffered by employees whose vested benefits are terminated," as referred to in Nachman Corporation v. Pension Benefit Guaranty Corporation, 446 U.S. 359, 375-76, 100 S. Ct. 1723, 64 L. Ed. 2d 354, 366-67 (1980),[61]

---

[60] Taken from a statement by Senator Bentsen, a member of the Senate Committee on Finance most active in sponsoring ERISA, reprinted in 3 Legislative History of the Employee Retirement Income Security Act of 1974, 94th Cong., 2nd Session 4793 (Comm. Print 1976).

[61] Nachman which dealt with termination of pension plans held that vested benefits in a defined benefit pension plan were characterized as "nonforfeitable" and were insurable under § 402(a) of ERISA, 29 USCS § 1322(a), despite plan provision limiting benefits, upon termination, to assets in the pension fund.

reh'g denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1137

(1980), when it said:

> Congress wanted to correct this condition (deprivation
> of anticipated employee retirement benefits) by making
> sure that if a worker has been promised a defined
> pension plan benefit upon retirement--and if he has
> fulfilled whatever conditions are required to obtain a
> vested benefit--that he actually receive it.

McWilliams was promised, upon retirement, a defined pension

benefit:  health care coverage for himself and his wife until

they reached age 65.  In return for his early retirement, health

care benefits for Eugene and Gloria McWilliams vested.  The

McWilliams are entitled to their receipt.  It is the province of

this court to see "that [they] actually receive it."  It will be

so ordered.


**DAMAGES**

        Under any of the **contract holdings**, or the **alternate**

**and supplemental ERISA holdings**, AMI is liable for damages

suffered by the McWilliams.  Under **the breach of Alabama state**

**contract claims** AMI is liable for $2,115.16 in medical expenses

suffered by the McWilliams until time of trial; assumption of all

medical bills, if any, incurred since trial; prejudgment interest

on the $2,115.16; and damages for mental anxiety in the amount of

$250,000.00 for Mr. McWilliams and $250,000.00 for Mrs.

McWilliams.  AMI is to reinstate medical insurance coverage for

the McWilliams until each reaches the age of 65 and is covered by Medicare.

Under any of the **alternative and supplemental holdings under ERISA** AMI is liable for all medical expenses suffered by the McWilliams, attorneys' fees and costs, and prejudgment interest. St. Joseph's, 929 F.2d at 1558. AMI is financially able to satisfy the award of attorneys' fees and costs, an award which will deter others from acting under similar circumstances. There is no pain or deterrence in fashioning a remedy in which the offending party has nothing to lose but its own litigation costs.

Injunctive relief is proper. AMI is to reinstate the health care coverage for the McWilliams until each reaches the age of 65 and is eligible for Medicare.

As much as it would like to, the court, unfortunately, cannot award punitive damages. There is no provision for punitive damages under Alabama contract law, and punitive damages are not available under ERISA. For the egregious behavior present in the case at bar punitive damages ought to be available under both recoveries.

## CONCLUSION

In summary, the court believes the action before it includes a claim of breach of contract and **HOLDS** the following:

1. AMI is liable to the McWilliams for breach of a simple contract.

2. AMI is liable to the McWilliams for breach of a contract formed by promissory estoppel principles.

3. AMI is liable to the McWilliams for breach of a contract formed pursuant to the principles stated by Restatement (Second) of Contracts § 90.

In the **alternative**, if it is determined that the instant case is not based on contract but is an ERISA action, and **supplemental** in any event to the contract holdings, the court **HOLDS** the following:

1. AMI is liable to the McWilliams under ERISA under the doctrine of equitable/promissory estoppel.

2. AMI is liable to the McWilliams because their interests had vested under ERISA.

An order consistent with this opinion is being entered contemporaneously herewith.

DONE and ORDERED this _____ day of March 1997.

_____
UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.